BONNETT, FAIRBOURN,
   FRIEDMAN & BALINT, P.C.
ANDREW S. FRIEDMAN (AZ005425)
ELAINE A. RYAN (AZ 012870)
PATRICIA N. SYVERSON (CA 203111; AZ 020191)
afriedman@bffb.com
eryan@bffb.com
psyverson@bffb.com
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Telephone: (602) 274-1100
Facsimile: (602) 798-5825

THE LAW OFFICES OF WILLIAM C. WRIGHT, P.A.
WILLIAM C. WRIGHT
301 Clematis Street, Suite 3000
West Palm Beach, FL 33401
willwright@wrightlawoffice.com
Telephone: (561) 514-0904
Facsimile: (561) 514-0905

Attorneys for Plaintiff

FILED
2009 MAY 22 PM 12: 03
US DISTRICT COURT
MIDDLE DISTRICT OF FL
ORLANDO FLORIDA

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION

| | |
|---|---|
| KIM ANN WALDEN, on behalf of herself and all others similarly situated,<br><br>            Plaintiff,<br>v.<br>IOVATE HEALTH SCIENCES U.S.A. INC., a Delaware corporation, and IOVATE HEALTH SCIENCES INC., a Canadian corporation,<br><br>            Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Violation of Deceptive and Unfair Trade Practices Act, Florida Regulation of Trade, Commerce, Investments, and Solicitations 501.201, *et seq.*<br>2. Common Law Fraud<br>3. Unjust Enrichment<br><br>**[JURY TRIAL DEMANDED]** |

CLASS ACTION COMPLAINT
- 1 -

## NATURE OF THE ACTION

1. Defendants manufacture, distribute and sell the Hydroxycut line of products (the "Products") in Florida and throughout the United States.

2. This is a class action challenging Defendants' practice of affirmatively misrepresenting the safety of the Products, and failing to warn consumers and omitting material facts from their Product packages, marketing materials, and advertising regarding the potentially serious adverse health risks associated with consumption of the Products. Plaintiff, on behalf of herself and a Class of Florida consumers of the Products, is seeking actual and punitive damages, disgorgement of profits and/or restitution of the price paid for the Products. In addition, because of the potentially serious and unpredictable health risks associated with consumption of the Products which necessitate periodic diagnostic and medical examinations, Plaintiff seeks equitable relief in the form of medical monitoring.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction over this class action under 18 U.S.C. §1332(d), which under the provisions of the Class Action Fairness Act ("CAFA") explicitly provides for the original jurisdiction of the federal court in any class action in which any member of the Class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs. Plaintiff alleges that the total claims of individual class members in this action are well in excess of $5,000,000 in the aggregate, exclusive of interest and costs, and that the total number of members of the proposed Class is greater than 100, as required by 28 U.S.C. § 1332(d)(2), (5). As set forth below, Plaintiff is a citizen of Florida, whereas Iovate USA is a citizen of New York and/or Delaware.

4. Venue lies within this District pursuant to 28 U.S.C. § 1391(b)-(c) in that: Defendants Iovate Health Sciences U.S.A., Inc. and Iovate Health Sciences, Inc. conduct business in this District; certain acts giving rise to the claims asserted in this Complaint occurred within this District; the illegal actions of Defendants, as alleged in this Complaint, caused damage to Plaintiff and Class members within this District; and Plaintiff resides within this District.

## THE PARTIES

5. Plaintiff Kim Ann Walden is an individual residing in Brevard County, Florida. During the Class period, Ms. Walden purchased the Product for personal consumption, suffered injury in fact and lost money and property as a result of the unfair methods of competition and/or unfair, deceptive and/or unconscionable acts or practices described herein.

6. Defendant Iovate Health Sciences U.S.A., Inc. ("Iovate USA") is a Delaware corporation with its principal place of business in Blasdell, New York. For the purposes of diversity jurisdiction, Iovate USA may be considered a "citizen" of New York and/or Delaware. Defendant Iovate USA is responsible for the distribution of the Products to consumers throughout the United States, including tens of thousands of consumers in Florida.

7. Defendant Iovate Health Services, Inc. ("Iovate Canada") is a Canadian corporation with its principal place of business in Oakville, Ontario, Canada. Defendant Iovate Canada is responsible for research, development, production and manufacture of the Products.

8. Defendants Iovate Canada and Iovate USA shall be referred to collectively as "Defendants" or "Iovate."

9. Plaintiff is informed and believes, and thus alleges, that at all times herein mentioned, each of the Defendants was the agent, employee, representative, partner, joint venturer, and/or alter ego of each of the other Defendants and, in doing the things alleged herein, was acting within the course and scope of such agency, employment, representation, on behalf of such partnership or joint venture, and/or as such alter ego, with the authority, permission, consent, and/or ratification of each of the other Defendants.

## DEFENDANTS' UNLAWFUL CONDUCT

10. Defendants manufacture and distribute a line of dietary supplements under the Hydroxycut brand name. Fourteen (14) of these Products are the subject of this Complaint and include: Hydroxycut Regular Rapid Release Caplets, Hydroxycut Caffeine-Free Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, Hydroxycut Max Liquid Caplets, Hydroxycut Regular Drink Packets, Hydroxycut Caffeine-Free Drink Packets, Hydroxycut Hardcore Drink

Packets (Ignition Stix), Hydroxycut Max Drink Packets, Hydroxycut Liquid Shots, Hydroxycut Hardcore RTDs (Ready-to-Drink), Hydroxycut Max Aqua Shed, Hydroxycut 24, Hydroxycut Carb Control and Hydroxycut Natural (hereinafter referred to collectively as the "Products").

11. Defendants represent that in 2008 they sold approximately 9 million units of the Products in Florida and throughout the United States in grocery stores, health food stores and pharmacies.

12. These Products are designed as "dietary supplements for weight loss as fat burners, energy enhancers, as low carb[ohydrate] diet aids and to promote water loss." FTS-HHS FDA, *"Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,"* Transcript dated 5/1/09 at p. 1 (Exhibit A, attached hereto).

13. Under the 1994 Dietary Supplement Health and Education Act (DSHEA), manufacturers of dietary supplement ingredients sold in the United States before October 15, 1994, such as Iovate Canada, are not permitted to market unsafe or ineffective products. FTS-HHS FDA, *"Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,"* Transcript dated 5/1/09 at p. 3.

14. In addition, under DSHEA, all new dietary ingredients marketed after October 15, 1994, require pre-market notification that assures the dietary supplement that contains the new dietary ingredients will be safe under the conditions described on the product label. FTS-HHS FDA, *"Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,"* Transcript dated 5/1/09 at p. 4.

15. Further, under DSHEA, beginning in December 2007, any manufacturer, including Defendant Iovate Canada, is obligated to report any serious adverse events reports they receive to the FDA within 15 days of receipt. FTS-HHS FDA, *"Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,"* Transcript dated 5/1/09 at p. 4.

16. Thus, pursuant to DSHEA and FDA guidelines, Defendants are required to market safe and effective products, as well as verify the safety of any new ingredients in their Products.

17. Defendants marketed their Products as the "the right choice for fast weight loss" and represented that the Products are made of "all natural" ingredients which are "research-proven" to work effectively. The Products' packaging promotes their use to "increase energy," "burn calories" and "control appetite." Specifically, the Products' packaging states:

> "Hydroxycut® is America's #1 selling weight-loss supplement. Hydroxycut really does work - fast! Utilizing sophisticated Rapid-Release Caplets, Hydroxycut is doctor formulated with clinically proven ingredients to help you lose up to 4.5 times the weight than diet and exercise alone. Now with an improved HydroxyTea® blend, there's even more reason to love Hydroxycut®."

18. The Products' packaging also states: "[d]on't take chances - you deserve the best! Put your trust in the power of Hydroxycut® and discover for yourself why millions of men and women all across America have used Hydroxycut. For fast weight loss, make Hydroxycut® your #1 choice today!"

19. The Products' packaging emphasizes that the Products are "doctor formulated" and approved. In this regard, the Products' packaging boasts that the Products are "Backed by Science" and includes a picture of Dr. John Marshall, D.O., "Resident Physician," and his statement that "Hydroxycut® is a product that has ingredients proven to work. I've recommended it to a number of men and women and have used it myself with fantastic results." The Products' packaging also credits Dr. Marvin Heuer, FAAFP, Iovate's Chief Scientific Officer, with formulating the Products.

20. As required by DSHEA, Defendant Iovate USA provided written notification to the FDA that the representations Defendants made regarding the safety and efficacy of the Products were "truthful and not misleading." *See, e.g.*, Iovate USA letter to FDA, dated 1/18/06 regarding Hydroxycut Hardcore (Exhibit B).

21. In truth, Defendants misrepresented the safety of their Products. Defendants failed to inform consumers, and omitted material facts from the Products' labeling and packaging, regarding the potentially serious adverse health risks associated with use of the Products, including Rhabdomyolysis (muscle damage that can lead to kidney failure and other health problems), death, cardiovascular symptoms, hypertension, elevated liver enzymes that can indicate liver failure, kidney

failure and seizures, jaundice, brown urine, nausea, vomiting, light colored stool, unusual tiredness, weakness, stomach or abdominal pain, unexplained itching and loss of appetite.

22. Consumers have experienced one or more of these potentially serious adverse health risks after consuming the Products. The FDA is currently aware of 23 reported cases of adverse liver effects experienced by consumers of the Products, including asymptomatic blood liver enzyme changes, jaundice, liver damage, liver transplant and death. FTS-HHS FDA, *"Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,"* Transcript dated 5/1/09 at p. 2.

23. In addition, the FDA is aware of four case reports in the medical literature involving sick patients who had consumed the Products and were diagnosed with serious liver disease. FTS-HHS FDA, *"Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,"* Transcript dated 5/1/09 at p. 2.

24. Because of the reported incidents of serious liver damage and other potentially serious adverse health risks associated with consumption of the Products, on May 1, 2009, the FDA "strongly advise[d]" consumers of "the potential risk of severe liver injury" associated with consumption of the Products and to discontinue use of all the Products. FTS-HHS FDA, *"Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,"* Transcript dated 5/1/09 at p. 2.

25. Specifically, the FDA's announcement stated:

> The FDA has received 23 reports of serious health problems ranging from jaundice and elevated liver enzymes, an indicator of potential liver injury, to liver damage requiring liver transplant. One death due to liver failure has been reported to the FDA. Other health problems reported include seizures; cardiovascular disorders; and rhabdomoyolysis, a type of muscle damage that can lead to other serious health problems such as kidney failure.
>
> Liver injury, although rare, was reported by patients at the doses of Hydroxycut recommended on the bottle. Symptoms of liver injury include jaundice (yellowing of the skin or whites of the eyes) and brown urine. Other symptoms include nausea, vomiting, light-colored stools, excessive fatigue, weakness stomach or abdominal pain, itching, and loss of appetite.
>
> "The FDA urges consumers to discontinue use of Hydroxycut products in order to avoid any undue risk. Adverse events are rare, but exist. Consumers should consult a physician or other health care professional if

they are experiencing symptoms possibly associated with these products," said Linda Katz, M.D., interim chief medical officer of the FDA's Center for Food Safety and Applied Nutrition.

26. Defendants' Products contain proprietary blends of overlapping ingredients that are associated with the serious adverse health risks caused by these Products. Because each Product contains a "blend" of ingredients, it is extremely difficult to isolate the specific ingredients which cause the harm. As noted by the FDA, the "reaction is idiosyncratic," meaning that it is "not [] predictable, it does not appear to be dose response relationship between taking specific amount or taking access amount or taking it for a long versus a short duration of time or that there are any specific risk factors. Most of the individuals in which we've had an adverse event reports have normal liver functions and were otherwise healthy individuals before we started to get a report." FTS-HHS FDA, "*Hydroxycut Dietary Supplement FDA Warns Consumers to Stop Using Hydroxycut Products Risk of Liver Injury,*" Transcript dated 5/1/09 at p. 11.

27. As the manufacturer and distributor of the Products, Defendants possess specialized knowledge regarding the content and effects of the "proprietary blend" of ingredients contained in the Products and are in superior positions to learn of the effects and have learned through the adverse event reports and other sources of the harmful effects their Products will have on consumers.

28. Defendants are aware that there are other products used for weight loss and as dietary supplements that do not present the same potential adverse health risks and could have reformulated their Products accordingly, but chose not to.

29. Defendants' misrepresentations of the Products' safety and failure to warn consumers of the potentially serious adverse health risks of the Products has caused injury to Plaintiff and Class members entitling them to actual damages, punitive damages and to equitable relief in the form of disgorgement of Defendants' profits and full restitution of all monies paid for the Products. Had Plaintiff and Class members known of the potential serious side effects associated with consumption of the Products they would not have purchased them.

30. In addition, because the potential serious health risks posed by the Products' proprietary blend of overlapping ingredients are not predictable, Plaintiff and Class members will

require periodic diagnostic and medical examinations. Thus, Plaintiff and Class members also are entitled to equitable relief in the form of medical monitoring including, *inter alia*, funding to: notify all Class members of the potential health risks associated with use of the Products; study the long-term effects of the Products; gather and forward information to treating physicians for diagnosis and treatment; aid in early diagnosis and treatment; and pay for diagnosis and preventative medical treatment.

## PLAINTIFF'S EXPERIENCES

31. Plaintiff Kim Ann Walden purchased Hydroxycut Max in February 2009 for approximately $40 a package.

32. Prior to purchasing the Product, Plaintiff Walden read the package and relied on the representations contained on the Product package.

33. Plaintiff Walden consumed the Hydroxycut Max as directed.

34. Plaintiff Walden purchased and consumed the Product believing it was reasonably safe as a dietary supplement and for weight-loss purposes. Plaintiff did not know the Product posed serious adverse health risks including, Rhabdomyolysis (muscle damage that can lead to kidney failure and other health problems), death, cardiovascular symptoms, hypertension, elevated liver enzymes that can indicate liver failure, kidney failure and seizures, jaundice, brown urine, nausea, vomiting, light colored stool, unusual tiredness, weakness, stomach or abdominal pain, unexplained itching and loss of appetite.

35. On or about May 1, 2009, Plaintiff Walden learned of the potential serious health risks caused by the Products, stopped consuming the Products and will no longer purchase them.

36. Plaintiff Walden has suffered injury in fact and lost money and property as a result of the alleged conduct. She has been injured in the amount paid for the Product because had she known of the potential health risks she would not have purchased the Product. Plaintiff also has been injured in that she will require periodic diagnostic and medical examinations to ensure she either has not suffered any physical harm from her consumption of the Products or, if harmed, she receives proper treatment.

## EQUITABLE TOLLING

37. Defendants have affirmatively and wrongfully concealed their unfair methods of competition and/or fraudulent, unfair or deceptive acts or practices from Plaintiff and Class members including misrepresenting the safety of the Products and failing to warn consumers and omitting material facts from their labeling and advertising regarding the potentially serious adverse health risks associated with consumption of the Products. Plaintiff and other Class members did not know and could not reasonably have known of Defendants' unfair methods of competition and/or fraudulent, unfair or deceptive acts or practices, nor could they have reasonably discovered the same until after the FDA's May 1, 2009 public announcement.

38. There is a substantial nexus between the wrongful conduct that has occurred within the statute of limitations and the misconduct prior to that time. The same safety misrepresentations and material adverse health risk omissions are at issue.

39. The statute of limitations applicable to any claim brought by Plaintiff or other Class members as a result of the conduct alleged herein has been tolled as a result of Defendants' concealment.

## CLASS ALLEGATIONS

40. Plaintiff brings this action on her own behalf and as a Class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class:

> All Florida residents who purchased any of the Hydroxycut Products within the applicable limitations period.[1]

---

[1] The "Hydroxycut Products" include: Hydroxycut Regular Rapid Release Caplets, Hydroxycut Caffeine-Free Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, Hydroxycut Max Liquid Caplets, Hydroxycut Regular Drink Packets, Hydroxycut Caffeine-Free Drink Packets, Hydroxycut Hardcore Drink Packets (Ignition Stix), Hydroxycut Max Drink Packets, Hydroxycut Liquid Shots, Hydroxycut Hardcore RTDs (Ready-to-Drink), Hydroxycut Max Aqua Shed, Hydroxycut 24, Hydroxycut Carb Control and Hydroxycut Natural.

41. Excluded from the Class are Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which the Defendants have a controlling interest or which is related to or affiliated with the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of any such excluded party.

42. Plaintiff and the members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impractical.

43. Plaintiff's claim is typical of the claims of the members of the Class. The named Plaintiff is a member of the Class of victims described herein.

44. The named Plaintiff is willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or which directly and irrevocably conflict with, the interests of the other members of the Class.

45. The self-interests of the named Class representative are co-extensive with, and not antagonistic to, those of the absent Class members. The proposed representative will undertake to represent and protect the interests of the absent Class members.

46. The named Plaintiff has engaged the services of counsel indicated below. Said counsel are experienced in complex class litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent the named Class representative and absent Class members.

47. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

48. This action involves questions of law and fact common to Plaintiff and all Class members concerning violations of Florida's consumer protection statute, common law fraud and unjust enrichment. These common questions predominate over any issues affecting individual members of the Class and include:

    (a)    Whether the Products had potentially serious adverse health risks when used as directed;

(b) Whether Defendants engaged in unfair methods of competition and/or unfair, deceptive or unconscionable acts or practices by misrepresenting the safety of the Products and/or by failing to warn consumers of the potentially serious adverse health risks associated with consumption of the Products;

(c) Whether Plaintiff and Class members have been injured by Defendants' misrepresentations and/or failure to warn of the potentially serious adverse health risks associated with consumption of the Products;

(d) Whether Defendants have been unjustly enriched by their unfair, deceptive or unconscionable acts or practices;

(e) Whether Plaintiff and Class members are entitled to actual damages in the amount paid for the Products;

(f) Whether Plaintiff and Class members are entitled to disgorgement of Defendants' profits and/or restitution of the monies they paid to purchase the Products;

(g) Whether Plaintiff and Class members are entitled to equitable relief in the form of medical monitoring; and

(h) Whether Plaintiff and Class members are entitled to punitive damages.

49. Judicial determination of the common legal and factual issues essential to this case is far more efficient and economical as a class action than in piecemeal individual determinations.

50. There is no plain, speedy or adequate remedy other than by maintenance of this lawsuit as a class action because individual damages are relatively small, making it economically infeasible for Class members to pursue remedies individually. The prosecution of separate actions by individual members of the Class, even if theoretically possible, would create a risk of inconsistent or varying adjudications with respect to individual Class members against Defendants and would establish incompatible standards of conduct for Defendants.

51. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) given the complexity of issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendants committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when Defendants' liability has been adjudicated, claims of all Class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort and expense, and ensure uniformity of decisions; and

(d) without a class action, many Class members would continue to suffer injury, and Defendants' violations of law will continue without redress while Defendants continue to reap and retain the substantial proceeds of their wrongful conduct.

52. Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

53. This action also is appropriately certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to all members of the Class and final injunctive relief is appropriate to the Class as a whole.

54. Plaintiff seeks equitable relief on behalf of the entire Class on grounds generally applicable to the entire Class.

55. In addition, Plaintiff seeks actual and/or punitive damages, to the extent available.

## FIRST CAUSE OF ACTION
### VIOLATION OF DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, REGULATION OF TRADE, COMMERCE, INVESTMENTS AND SOLICITATIONS, §501.201 ET SEQ.

56. Plaintiff incorporates by reference each of the preceding allegations as though fully set forth herein.

57. This cause of action is brought under the Florida Deceptive and Unfair Trade Practices Act, Regulation Of Trade, Commerce, Investments And Solicitations, §501.201, *et seq.* (the "FDUTPA" or the "Act").

58. The FDUTPA prohibits methods of unfair competition and unfair, deceptive or unconscionable acts and practices. Plaintiff and Class members come within the FDUTPA's protection as they are "consumers" as defined by §501.203(7).

59. Defendants misrepresented the safety of the Products and failed to warn consumers of the potentially serious adverse health risks associated with consumption of the Products on the Product labels, in Product advertising, and in other marketing materials.

60. As the manufacturer and distributor of the Products, Defendants possess specialized knowledge regarding the content and effects of the "proprietary blend" of ingredients contained in the Products and are in superior positions to learn of the effects and have learned of the harmful effects their Products will have on consumers. This information was not known by or available to the public. Further, this information was not widely disseminated among Defendants' employees but was known only to higher level employees within the Companies that had reason to know of such information. As a result, Defendants knew, or should have had reason to know, that their safety representations and failure to warn of the adverse health risks associated with consumption of their Products were unfair, deceptive and/or unconscionable.

61. Defendants' misrepresentation of the Products' safety and failure to warn consumers of the potentially serious adverse health risks associated with consumption of the Products in their advertising, marketing materials and on the Products' packaging was intended to, had the capacity to and did, deceive Plaintiff and Class members into purchasing the Products.

62. Plaintiff and all Class members purchased Defendants' Products in packages that uniformly misrepresented their safety and/or omitted material facts including that the Products pose potentially serious adverse health risks and the nature of those risks.

63. Neither Plaintiff nor any of the Class members knew or were privy to any information about the potential health risks posed by Defendants' Products at the time they purchased the Products.

64. Plaintiff and Class members read and relied on the accuracy of the representations on the Product packages, as well as Defendants' advertising and marketing materials in purchasing the Products.

65. Plaintiff and Class members have been actually injured and have suffered an ascertainable loss of money proximately caused by Defendants' unfair methods of competition and/or unfair, deceptive or unconscionable acts and practices and are entitled to actual damages in the approximate amount of the $30-$60 they paid for each of Defendants' Products.

66. Defendants' unfair, deceptive and/or unconscionable conduct was knowing, deliberate, wanton, reckless and malicious, and undertaken in conscious disregard of, and reckless indifference to, Plaintiff's and Class members' interests, and otherwise of a character warranting punitive damages. The gravity of Defendants' alleged wrongful conduct outweighs any purported benefits attributable to such conduct. There also were reasonably available alternative dietary and weight-loss formulations that Defendants could have manufactured and distributed that did not have the same potentially serious adverse health risks.

67. Plaintiff and Class members are entitled to equitable relief in the form of full restitution of all monies paid for Defendants' Products and/or disgorgement of the profits Defendants received from sales of the Products.

68. Because Defendants' unfair, deceptive and/or unconscionable conduct has exposed Plaintiff and Class members to potentially serious health risks which, because of their unpredictability as alleged above, necessitate periodic diagnostic and medical examinations, Plaintiff and Class members also are entitled to equitable relief in the form of medical monitoring that provides for the establishment of a fund to: notify all Class members of the potential health risks associated with use of the Products; study the long-term effects of the Products; gather and forward

information to treating physicians for diagnosis and treatment; aid in early diagnosis and treatment; and pay for diagnosis and preventative medical treatment.

69. Plaintiff also is entitled to an award of attorneys' fees and costs pursuant to §501.2105(1).

## SECOND CAUSE OF ACTION
## COMMON LAW FRAUD

70. Plaintiff incorporates by reference each of the preceding allegations as though fully set forth herein.

71. Defendants misrepresented the safety of the Products and failed to warn consumers of the Products' potentially serious adverse health risks in their advertising, marketing materials and on the Products' packaging.

72. As the manufacturer and distributor of the Products, Defendants possess specialized knowledge regarding the content and effects of the "proprietary blend" of ingredients contained in the Products and are in superior positions to learn of the effects and have learned of the harmful effects their Products will have on consumers. This information was not known by or available to the public. Further, this information was not widely disseminated among Defendants' employees but was known only to higher level employees within the Companies that had reason to know of such information. As a result, Defendants knew, should have had reason to know, or recklessly disregarded that their representations were false and their material omissions were misleading and deceptive.

73. Defendants' misrepresentation of the Products' safety and failure to warn consumers of the potentially serious adverse health risks associated with consumption of the Products in their advertising, marketing materials and on the Products' packaging was intended to, had the capacity to and did, induce Plaintiff and Class members into purchasing the Products.

74. Plaintiff and all Class members purchased Defendants' Products in packages that misrepresented the safety and/or uniformly omitted material facts including that the Products pose potentially serious adverse health risks and the nature of those risks.

75. Neither Plaintiff nor any of the Class members knew or were privy to any information about the potential health risks posed by Defendants' Products at the time they purchased the Products.

76. Plaintiff and Class members read and justifiably relied on the accuracy of the representations on the Product packages, as well as Defendants' advertising and marketing materials in purchasing the Products.

77. Plaintiff and Class members have been actually injured and have suffered an ascertainable loss of money proximately caused by Defendants' fraudulent conduct in the approximate amount of the $30-$60 they paid for each of Defendants' Products.

78. Plaintiff and Class members therefore are entitled to actual damages in the amount of the price they paid for the Products.

79. Defendants' fraudulent conduct was knowing, deliberate, wanton, reckless and malicious, and undertaken in conscious disregard of, and reckless indifference to, Plaintiff's and Class members' interests, and otherwise of a character warranting punitive damages. The gravity of Defendants' alleged wrongful conduct outweighs any purported benefits attributable to such conduct. There also were reasonably available alternative dietary and weight-loss formulations that Defendants could have manufactured and distributed that did not have the same potentially serious adverse health risks.

80. Plaintiff and Class members are entitled to disgorgement of the profits Defendants received from the sale of the Products.

81. Because Defendants' fraudulent conduct has exposed Plaintiff and Class members to potentially serious health risks which, because of their unpredictability as alleged above, necessitate periodic diagnostic and medical examinations, Plaintiff and Class members also are entitled to equitable relief in the form of medical monitoring that provides for the establishment of a fund to: notify all Class members of the potential health risks associated with use of the Products; study the long-term effects of the Products; gather and forward information to treating physicians for diagnosis

and treatment; aid in early diagnosis and treatment; and pay for diagnosis and preventative medical treatment.

82. Plaintiff also is entitled to an award of attorneys' fees and costs.

## THIRD CAUSE OF ACTION
## UNJUST ENRICHMENT

83. Plaintiff incorporates by reference each of the preceding allegations as though fully set forth herein.

84. Plaintiff and Class members conferred a benefit on Defendants by purchasing the Products.

85. Defendants accepted and/or retained the benefits conferred in the amount of the profits they earned from sales of the Products to Plaintiff and Class members.

86. Defendants have benefited from their unfair methods of competition and/or unfair, deceptive, or unconscionable acts and practices at the expense of Plaintiff and Class members, under circumstances in which it would be inequitable for Defendants to be permitted to retain the benefit.

87. Plaintiff does not have an adequate remedy at law against Defendants.

88. Plaintiff and Class members are entitled to disgorgement of the profits derived from the sale of the Products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment:

A. Certifying this action as a plaintiff class action as set forth above;

B. Awarding Plaintiff and Class members actual damages in the amount paid for the Products;

C. Awarding Plaintiff and Class members Plaintiff punitive damages;

D. Awarding Plaintiff and Class members equitable relief in the form of restitution of all monies paid for the Products, disgorgement of Defendants' profits from sales of the Products, and establishing a fund for medical monitoring;

E. Awarding Plaintiff and Class members pre-judgment and post-judgment interest as provided by law;

F. Awarding Plaintiff attorneys' fees and costs; and

G. Awarding such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: May 18, 2009

THE LAW OFFICES OF WILLIAM C. WRIGHT, P.A.

_/s/ William C. Wright_
WILLIAM C. WRIGHT 0138861
301 Clematis Street, Suite 3000
West Palm Beach, FL 33401
Telephone: (561) 514-0904
Facsimile: (561) 514-0905

BONNETT, FAIRBOURN, FRIEDMAN
 & BALINT, P.C.
Andrew S. Friedman
Elaine A. Ryan
Patricia N. Syverson
2901 N. Central Avenue, Suite 1000
Phoenix, Arizona 85012-3311
Telephone: 602-274-1100
Facsimile: 602-798-5860

Attorneys for Plaintiff